UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR No. 11-163WES |
| | : | |
| ERIC VALDEZ | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) and 18 U.S.C. § 3401(i) for proposed findings of fact concerning whether Defendant Eric Valdez is in violation of the terms of his supervised release and, if so, for recommended disposition. In compliance with that directive and in accordance with 18 U.S.C. § 3583(e) and Fed. R. Crim. P. 32.1, hearings were conducted on March 18, 22 and 27, and on April 4 and 12, 2019. At the initial appearance on March 18, 2019, I ordered that Defendant be detained. For the reasons that follow, I recommend the following: that the Court adopt my conclusion that Defendant is guilty of Violation No. 1 and not guilty of Violation No. 4; that, based on his admissions, the Court find Defendant guilty of Violation Nos. 2, 3 and 5; and that the Court impose a sentence of incarceration for eighteen months with no further term of supervised release.

## I.     PROCEDURAL BACKGROUND

On March 15, 2019, the Court granted the Probation Office's petition for the issuance of a warrant charging Defendant with the following violations:

**Violation No. 1: The defendant shall not commit another federal, state, or local crime.**

On or about December 2018, the defendant committed the offense of Felon in Possession of a Firearm, as evidenced by his possession of a firearm in a video posted on the YouTube website.

**Violation No. 2: The defendant shall not commit another federal, state, or local crime.**

On January 16, 2019, Mr. Valdez committed the offense of Driving with a Suspended/Revoked/Canceled License – 3rd + Offense, as evidenced by his arrest by Rhode Island State Police.  Mr. Valdez's case remains pending in Third Division District Court under Dckt. No. 31-2019-00748.

**Violation No. 3: The defendant shall not commit another federal, state, or local crime.**

On February 2, 2019, Mr. Valdez committed the offense of Driving with a Suspended/Revoked/Canceled License – 3rd + Offense, as evidenced by his arrest by Rhode Island State Police.  On March 14, 2019, this case, under Dckt. No. 31-2019-01367, was transferred to Superior Court.

**Violation No. 4: The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer.**

On or about December 2018, the defendant was filmed in a rap video with convicted felons.  Specifically, James Leary, who was on federal supervision, and Damon Winslow, who is currently detained pending federal charges.

**Violation No. 5: The defendant shall participate in a manualized behavioral program as directed by the USPO.  Such program may include group sessions led by a counselor or participation in a program administered by the USPO.  The defendant shall pay for the cost of treatment to the extent he is able as determined by the probation officer.**

Mr. Valdez failed to attend treatment at Bridgemark on December 18, 2018, and February 21, 2019.

Defendant initially appeared before the Court on March 18, 2019, and requested a revocation hearing, which was scheduled for March 27.

Prompted by the government's motion for a conflict waiver hearing (ECF No. 38),[1] on March 20, 2019, I conducted a telephonic conference with counsel, followed by an *ex parte* conference with Attorney Fitzgerald. Finding that the circumstances posed a potential, but waivable, conflict pursuant to Rule 1.7 of the Rhode Island Rules of Professional Conduct, the Court appointed special counsel to advise Defendant regarding the potential conflict. At a hearing held on March 22, 2019, the specially-appointed counsel told the Court that Defendant had been fully advised of the potential for a conflict of interest and had made an informed decision to waive the conflict, including that he wished to continue to be represented by Attorney Fitzgerald; Defendant confirmed his waiver of the potential conflict on the record in direct colloquy with the Court.

On March 27, 2019, the revocation hearing was conducted. Before the evidentiary phase of the hearing, Defendant waived his right to present evidence as to Violation Nos. 2, 3 and 5 and admitted that he had committed those violations; based on the admissions, I found Defendant guilty of Violation Nos. 2, 3 and 5.

Evidence was presented pertaining to Violation Nos. 1 and 4. At the end of the hearing, I took under advisement the issue of guilt as to both violations. On April 4, 2019, a hearing was held at which I announced my findings that Defendant is guilty as to Violation No. 1 and not guilty as to Violation No. 4, and the parties presented their sentencing arguments. The government argued for an above-range sentence based, in part, on Defendant's membership in the Trinitarios gang. Defendant vigorously responded that the Court should not consider these

---

[1] The potential for a conflict was created by Attorney Fitzgerald's simultaneous representation of both Defendant and defendant James Leary, CR No. 15-113WES, who was also charged with violating supervised release based on his appearance in the same rap video that formed the foundation for Violation Nos. 1 and 4 in this case; indeed, Defendant's association with Leary, a convicted felon, is part of the foundation for Violation No. 4. The conflict arose from counsel's limitation in advising each of them of the benefits and risks of testifying against the other.

gang-related facts because they are not relevant and were not proven.  To resolve the factual

dispute, the matter was continued to April 12, 2019, for an evidentiary hearing.  On April 12,

2019, the Court overruled Defendant's relevancy objection to the evidence proffered by the

government and the government presented evidence to establish Defendant's gang membership,

its public safety implications and the relationship of his gang membership to his appearance in

the rap video.  Following the further arguments of counsel and Defendant's declination of his

right to allocution, I took the issue of sentencing under advisement.

## II.    REVOCATION HEARING

### A.    Summary of Facts Applicable to Violation Nos. 1 and 4

Less than two months after recommencing supervision following his last revocation,

holding what looks like a black revolver, Defendant appeared in a rap video called "Damage

Dame - Top Dawg."  The rap video was filmed in December 2018 and publicly posted on the

social media platform, YouTube, sometime between December 2018 and February 2019.  In the

same rap video, other young men appear, including, as the government alleges, at least three

individuals (Damon Winslow, James Leary and Brendin McKinney) who are convicted felons.

Violation Nos. 1 and 4 are based on the rap video.  Violation No. 1 charges that Defendant is a

felon in possession of the black revolver that is clearly visible in his hand during parts of the rap

video.  Violation No. 4 charges that, by appearing in the rap video, he associated with convicted

felons, "specifically" Winslow and Leary; McKinney is not mentioned in the charge.

The rap video features Winslow as the leading performer.  He is rapping, making hand

signals and wielding and pointing devices that appear to be firearms, including one that emits a

green laser light.  The others in the rap video are also making hand signals and displaying,

sometimes pointing at the viewer, devices that appear to be firearms; some display cash during

one segment of the video; others just sit or stand and smoke.  The rap video appears to have been professionally put together in that the mesh of the camera shots and the movement of the participants pulse with the rhythmic beat of the instrumentation and the rap.

Three witnesses testified at the guilt phase of the revocation hearing: Special Agent Christian Jardin of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Rhode Island Bureau of Criminal Investigations Detective James Clift and Rhode Island Department of Corrections ("DOC") Investigator David Perry.  I found all three to be highly credible.  Sixteen exhibits were admitted full – these include the rap video (with both its visual and audio content);[2] many still screenshots from the rap video; photographs of a firearm capable of emitting a green laser light seized by the Providence Police after the video was made; the recording and a partial transcript of the post-arrest interview of the principal performer in the rap video, Winslow; and McKinney's criminal history.  Because of the dearth of evidence linking Defendant to the lyrics of the rap, either as writer or rapper (apart from his appearance in the video), and in light of their provocative and potentially prejudicial content,[3] the Court found the lyrics to be of marginal relevance.  Accordingly, Defendant's objection to admitting an uncertified transcript of the rap video was sustained.  Because they were cumulative of oral testimony, Providence police records regarding firearm seizures and Adult Correctional Institutions ("ACI") records reflecting "inmate events histories" for Defendant and McKinney were excluded.  Because Defendant did not object to the admissibility as full exhibits of the recording and the partial transcript of Winslow's post-

---

[2] As finder of fact, I watched the rap video over and over, played both at regular speed and at slow speed. Therefore, the facts in the text regarding what appears in the rap video are based not only on the testimony, but also on my observations of the rap video's visual content, which is sharp and clear.  By contrast, the lyrics of the rap are difficult to discern from listening to the rap video.  See n.3, *infra*.

[3] The lyrics are technically in evidence in that the rap video, including its audio content, was admitted full without objection.  However, apart from the repetition of the distinctive phrase, "Top Dawg," and the terms "bitch" and "nigga," it is difficult to discern the meaning of the words from listening to it.

arrest hearsay declaration, an email from Winslow's attorney offered to explain his unavailability to testify to these hearsay declarations was unnecessary and not admitted.

The testimony establishes that, in February 2019, the Providence Police alerted Special Agent Jardin to the availability of the rap video on social media, resulting in the investigation and arrest of Winslow on charges not directly related to the rap video. Agent Jardin testified that Winslow is the primary performer – the "Top Dawg" – who is rapping and displaying at least four firearms, including one with a distinctive green laser light. Winslow also displays hand signals and exchanges elaborate handshakes with others in the video, including Defendant.

Based on my own observation, corroborated by the testimony of Agent Jardin, one of the men appearing in the rap video is clearly Defendant. In portions of the rap video, he may be seen wearing a yellowish/lime-green bandana tied on his neck and a sweatshirt with the hood down; in these shots, his face and hair (in distinctive dreadlocks) are clearly visible. In most of these shots, he is holding a device that appears to be a black revolver. In other shots, the same individual appears with his face obscured by the bandana and sometimes with his hair largely (but not entirely) obscured by the hood.

Agent Jardin testified to his extensive experience and training with firearms, based on which he stated that all of the guns depicted in the video, including the black revolver held by Defendant, appear to be authentic and operable. In addition to being the same size, shape and color as real guns, he explained that the barrels are clear and unobstructed; none has the orange tip used to indicate a firearm is not operable. Agent Jardin pointed out that one of the guns in the video (but not held or touched by Defendant) was pointed directly at the camera; a round of ammunition is clearly visible in the right top chamber.

Agent Jardin's testimony focused on the manner in which the guns were handled in the rap video. He pointed out that Winslow and others consistently keep the trigger finger on the outside of the trigger guard. Defendant may be seen at least twice using this method for grasping the black revolver. Based on his experience and training, Agent Jardin testified that this is a safety precaution used to avoid an inadvertent pull on the trigger of a loaded gun.

During the investigation that followed the discovery of the rap video on the internet, on March 12, 2019, Agent Jardin interviewed Winslow who had been arrested on other charges. During the interview, Winslow was asked about the source of the guns used in the rap video; he answered, "That wasn't my guns. That's what I'm saying. Niggas just brought the props. . . . And they left." Gov. Ex. 15A at 2. When Agent Jardin asked Winslow if he was worried by the other men in the video pointing and holding "those things," Winslow stated, "You shouldn't be touching one if you don't know how to handle one. . . . If they don't know how to handle, they shouldn't be touching one. They should get the fuck away from me with one in their hand." Id. at 4. Agent Jardin followed up: "were they loaded?" Winslow responded, "Of course." Id.

Agent Jardin testified that agents focused on the gun handled by Winslow and others that emitted the green laser light, which functions as a sight on a target. During Agent Jardin's interview of Winslow, he asked about the gun with the green laser. Winslow stated, "That wasn't mine, but that's no longer with us neither. . . . [I]t ended up in somebody's hands, and a dummy went to jail with it." Id. at 2-3. Based on this information, Agent Jardin inquired of the Providence Police regarding guns recovered in the months immediately following the making of the rap video. The response was provided by Detective Clift, who testified that, of the forty-two guns seized in Providence in the timeframe, one emits a green laser light. Detective Clift added that he has examined hundreds, if not thousands, of seized guns and he has seen fewer than ten

equipped with a laser sight in his nineteen-year career.  Detective Clift displayed the gun seized by the Providence Police and demonstrated the green laser light.  Based on his examination of it, he stated that it is a Smith and Wesson semi-automatic forty caliber pistol and is an operable firearm able to fire a projectile.  Based on his visual comparison of the laser-emitting gun in the rap video to the laser-emitting gun seized by the Providence Police, Agent Jardin testified that they appear to be the same device.[4]

The final topic covered by Agent Jardin was the identification of McKinney, known by Agent Jardin to be a felon, standing next to Defendant in one segment of the rap video.  DOC Investigator David Perry testified that Defendant and McKinney were housed seven cells apart in maximum security at the ACI from July 13, 2015 to August 24, 2015.  During those forty-two days, Defendant and McKinney would have eaten and gone to recreation together daily.  Only convicted persons are housed in maximum security.

Also relevant to Violation No. 1 (felon in possession) is Defendant's criminal history, which permits the inference that Defendant is familiar with the handling of operable, loaded firearms.[5]  Specifically, in 2011, at the age of twenty-one, with a drug charge pending, as described in the Presentence Report, Defendant was arrested with a stolen .357 caliber revolver loaded with five hollow point rounds; at arrest, he referred to the gun as "my little sister"; post-arrest, he stated that he had taped around the handle to improve the grip and that he had

---

[4] Through Detective Clift, the government proffered the actual device with the working green laser light for the Court's inspection.  Based on my observation, I found that the proffered firearm appeared in all relevant respects (including the green laser light) to be identical to the one handled by Winslow and others in the rap video.  At the Court's direction, it was not marked as an exhibit.  Instead, photographs of it were admitted.

[5] This evidence may not be, and was not, considered as the foundation for the impermissible inference that Defendant's wrongful possession of a firearm in the past makes it more likely that he wrongly possessed one in the rap video.  See Fed. R. Evid. 404.

attempted to scratch off the serial number.  He pled guilty to possession of a stolen firearm and possession of a firearm with an obliterated serial number, as well as resisting arrest.

### B.    Law Applicable to Violation Nos. 1 and 4

The preponderance of the evidence is the applicable standard for the revocation of supervised release.  See Johnson v. United States, 529 U.S. 694, 700 (2000) (violations of supervised release need only be found by a judge under a preponderance of the evidence standard) (citing 18 U.S.C. § 3583(e)(3)); United States v. Bergeron, No. CR 03-116S, 2011 WL 1458787, at *1 (D.R.I. Mar. 15, 2011).  Preponderance of the evidence "is a more-likely-than-not standard." United States v. Tanco-Pizarro, 892 F.3d 472, 475 (1st Cir. 2018).  In making findings based on a preponderance of the evidence, the Court may rely on plausible inferences that are grounded in the evidence; it may not rely on guesswork or speculation.  See United States v. Montanez-Quinones, 911 F.3d 59, 73 (1st Cir. 2018); Figueroa v. Gelb, Civil Action No. 13-13008-IT, 2016 WL 3147354, at *2 (D. Mass. Apr. 20, 2016).

In a supervised release proceeding, the defendant does not have a full Sixth Amendment right to confront adverse witnesses.  United States v. Rodriguez, 919 F.3d 629, 2019 WL 1348280, at *3 (1st Cir. Mar. 26, 2019).  Accordingly, reliable hearsay evidence can be admitted. Fed. R. Evid. 1101(d)(3); United States v. Rondeau, 430 F.3d 44, 48 (1st Cir. 2005).  In deciding whether to consider hearsay, the court must weigh not only reliability, but also the government's proffered reason for not producing the declarant.  United States v. Portalla, 985 F.2d 621, 622 (1st Cir. 1993); see Fed. R. Crim. P. 32.1 (b)(1)(B)(iii), (2)(C); Fed. R. Evid. 1101(d)(3).

In this case, the government's burden is to prove by a preponderance that Defendant's appearance in the rap video establishes that he committed each of the two contested violations.

Violation No. 1 charges Defendant with breach of the condition that he not commit another federal, state or local crime.  Based on the rap video, the petition alleges that Defendant committed the offense of being a felon in possession of a firearm.  While the condition encompasses federal, state and local law, at the hearing, the government focused its evidence only on the law of Rhode Island.[6]  Rhode Island law criminalizes the possession of a firearm in R.I. Gen. Laws § 11-47-5, which provides in relevant part that, "No person shall purchase, own, carry, transport, or have in his or her possession any firearm if that person: (1) [h]as been convicted in this state or elsewhere of a crime of violence."  R.I. Gen. Laws § 11-47-5(a)(1).  A "crime of violence" is defined in R.I. Gen. Laws § 11-47-2(4) to include "possession with intent to manufacture, sell, or deliver a controlled substance classified in schedule I or schedule II."  A "firearm" is defined as "any machine gun, pistol, rifle, air rifle, air pistol, 'blank gun,' 'BB gun,' or other instrument from which steel or metal projectiles are propelled, or that may readily be converted to expel a projectile."  R.I. Gen. Laws § 11-47-2(5).  A "pistol" may also refer to a revolver.  R.I. Gen. Laws § 11-47-2(10); see State v. Moosey, 504 A.2d 1001, 1007 (R.I. 1986).  To be a "firearm," the device must either have the capability to expel a projectile or be readily convertible to do so.  State v. Hazard, 68 A.3d 479, 492, 499 (R.I. 2013).

In this case, Defendant's predicate "crime of violence" is his 2014 conviction (based on a *nolo contendere* plea) to manufacture, sell or deliver and possession with intent to deliver a schedule I/II substance.  Based on this felony conviction, Defendant was sentenced by the State to ten years, with thirty months to serve.[7]  Based on his conviction for that crime, Rhode Island

---

[6] The government did not rely on the federal statute, which includes the element that the firearm had been shipped or transported in interstate commerce.  18 U.S.C. § 922(g)(1).

[7] In this Court, Defendant was charged with and, on December 15, 2015, admitted this crime as a violation of his conditions as charged in a prior supervised release petition.  ECF No. 22 at 1-2 & n.1 (report and recommendation based on Defendant's admission, *inter alia*, to "manufacturing, possessing, delivering Schedule I/II").

state law bars him from possessing a firearm. Accordingly, to establish guilt on Violation No. 1, the government must prove that it is more likely than not that the black revolver that is seen in Defendant's hand in the rap video is a pistol or revolver with the capability of expelling a projectile or being readily converted to do so.

Violation No. 4 is focused on the other individuals in the rap video. It charges that, by being filmed in the rap video with other convicted felons, Defendant violated the condition barring him from associating with convicted felons. The petition names the individuals with whom Defendant is charged with associating: "Specifically, James Leary, who was on federal supervision, and Damon Winslow, who is currently detained pending federal charges."

In considering Violation No. 4, the Court must remain mindful that a defendant charged with a violation of supervised release is entitled to basic due process, which includes that the defendant must be given notice of the alleged violation. Fed. R. Crim. P. 32.1(b)(1)(B)(i), (2)(A-B); see Morrissey v. Brewer, 408 U.S. 471, 488-89 (1972) (parole revocation is subject to due process protections, including notice of the charges against the parolee). If the defendant does not receive notice of the charge until the hearing, the charge cannot be the basis for revocation. United States v. Reed, 573 F.2d 1020, 1023 (8th Cir. 1978). Also material is that a violation of an associational condition must harmonize with the "well-established jurisprudence under which we presume prohibited criminal acts require an element of *mens rea.*'" United States v. Napulou, 593 F.3d 1041, 1045 (9th Cir. 2010) ("the condition regulates only *knowing* contact with [prohibited] persons") (emphasis in original). At least one circuit has declared it to be a condition "that can't be complied with," United States v. Smith, 770 F.3d 653, 657 (7th Cir. 2014) ("[H]ow will the defendant know whether a person he associates with has a felony conviction?"), while others have looked carefully for evidence of the requisite knowledge of the

11

criminal history of associates, see United States v. Hicks, 510 F. App'x 167, 176 (3d Cir. 2013), mindful that "associational conditions do not restrict casual or chance meetings," United States v. Munoz, 812 F.3d 809, 820-21 (10th Cir. 2016).

> ### C.   Proposed Findings of Fact and Recommendation Regarding Guilt for All Charged Violations

The Court may readily dispose of Violation No. 4: the government charged Defendant with associating with two felons, Winslow and Leary, but put on evidence of Defendant's knowing association with a third felon, McKinney. To find guilt of an associational violation, the law is clear – the government must present evidence of *mens rea*, Napulou, 593 F.3d at 1045, and the defendant must be given notice of the charge, Reed, 573 F.2d at 1023. Neither is satisfied here. No evidence was presented of Defendant's knowledge of the criminal histories of Winslow and Leary.[8] And while the Court might infer Defendant's knowledge of McKinney's status as a felon from their forty-two day overlap in maximum security at the ACI,[9] McKinney was not named in the charge. Based on these deficits, I recommend that the Court find Defendant not guilty of Violation No. 4.

Violation No. 1 is another matter. I find that the facts in evidence and the plausible inferences to which they give rise (as opposed to mere speculation) prove that it is more likely than not that Defendant appeared in the rap video while possessing a firearm in violation of R.I. Gen. Laws § 11-47-5.

---

[8] In addition, the government did not present evidence that Leary is in the rap video.

[9] Because McKinney was not named in the charge, the Court did not grapple with two loopholes in this evidence: first, Investigator Perry's failure to specify whether a person convicted of a misdemeanor may be housed in maximum security; and, second, the lack of evidence that McKinney's appearance in the rap video with Defendant amounted to anything more than a chance encounter.

For starters, the evidence is unambiguous that it is Defendant who is the individual in the rap video with the black revolver and the yellowish/lime-green bandana.  Further, the inferences based on the evidence regarding the guns in the rap video render it more likely than not that the black revolver held by Defendant is a real "firearm."  This proof includes:

1. Agent Jardin's testimony, based on his observation of the video and his training and experience, that all of the guns in the video, including the black revolver held by Defendant, have the appearance of real and operable firearms;

2. Agent Jardin's testimony, based on his observation of the video and his training and experience, that Winslow and others are holding the guns with the index finger outside the trigger guard and that this way of grasping a gun is a common safety precaution used by persons experienced with firearms so that an inadvertent movement would not cause the trigger to be pulled;

3. The Court's observation that, in the rap video, Defendant is visible at least twice holding the black revolver with the index finger outside the trigger guard;

4. Winslow's post-arrest declarations[10] that the guns used in the rap video were not his but had been brought to the filming by some of those who appear in the video, that they were all loaded, but that he was not worried because the loaded firearms were being handled by individuals who are all experienced with such weapons;

5. Defendant's criminal history establishes him as an individual with experience in handling loaded firearms;

6. The dramatic proof cumulatively establishing that it is more likely than not that the gun seen in the rap video emitting the green laser light was subsequently seized by Providence Police, who (through the testimony of Detective Clift) confirmed it to be an operable firearm, thereby corroborating both Winslow's statement that the guns in the video were "loaded" and therefore real and his statement that the gun with the green laser light "ended up in somebody's hands, and a dummy went to jail with it"; and

7. Agent Jardin's testimony, based on his observation of the video and his training and experience, that one of the guns has a visible cartridge in the barrel, also corroborating Winslow's statement that the guns in the video were loaded.

---

[10] The circumstances of Winslow's hearsay declarations, particularly the fact that he was speaking against his own interest, render his statements reliable.  As noted in the text, several of Winslow's declarations were corroborated by other evidence.  Accordingly, I found Winslow's declarations to be evidence worthy of great weight.

Defendant argues that Winslow's use of the word "props" permits the inference that the guns were fakes specially used for filming. I found the opposite inference more plausible in light of Winslow's full statement – that the individuals appearing in the rap video had brought their own guns to be used as the "props," not that a videographer or other person had provided realistic-looking fake guns to be the "props." The inference that the guns are real is also buttressed by Winslow's response when asked if he was worried – Winslow explained he was not worried because the gun handlers knew "how to handle one," not because the guns were fake. Defendant also argued that Winslow may have been talking about a different gun than the one held by Defendant when he affirmed that "they [were] loaded." However, this interpretation is squarely contradicted by the collective "they" used in the question to which Winslow was responding. Further, the interpretation of Winslow's statement urged by the government – that all of the guns were "loaded" and therefore capable of expelling a projectile – is corroborated not only by the subsequent seizure of the laser-emitting device, confirmed to be an operable firearm, but also by the use of the safety grasp by the persons in the video (including Defendant) who are handling these guns.

Weighing this evidence, including the plausible inferences to which it gives rise, and using the preponderance standard, I find that the government has sustained its burden and proven that Defendant is guilty of being a felon in possession of a firearm pursuant to R.I. Gen. Laws § 11-47-5 as charged by Violation No. 1. I further find that the government has not sustained its burden of proving Defendant guilty of associating with persons convicted of a felony as charged by Violation No. 4. Based on the foregoing and on Defendant's admissions made on March 27, 2019, that he committed the conduct charged in Violation Nos. 2, 3, and 5, I recommend that the

14

Court adjudge Defendant guilty of committing Violation Nos. 1, 2, 3 and 5, and not guilty as to Violation No. 4.

## III.    SENTENCING

### A.    Summary of Facts Applicable to Sentencing on Violation Nos. 1, 2, 3 and 5

#### 1.    Defendant's History and Characteristics

On January 13, 2012, at the age of twenty-two, Defendant pled guilty to having possessed a stolen firearm with an obliterated serial number on November 10, 2010.  With only one adult conviction (for drug possession), he was classified as Criminal History Category ("CHC") I and sentenced leniently (below the guidelines range of eighteen to twenty-four months) to fourteen months and one day of imprisonment, with a term of three years of supervised release. Supervised release commenced on July 19, 2012, with a projected expiration date of July 18, 2015.

The first revocation petition was filed fourteen months later, on October 23, 2013.  Based on his admissions to the charges listed in the petition, Defendant was sentenced on February 19, 2016,[11] for violating five conditions of his supervised release, including two violations based on new crimes (serious drug trafficking and involvement in a street fight/shooting incident resulting in a conviction for simple assault), as well as three violations of travel, drug testing and reporting conditions.  In my report and recommendation regarding these violations, I noted Defendant's failure to comply with or attempt to benefit from supervision:

> During his almost fourteen months on supervision (ending with his arrest in connection with the crimes underlying Violation Nos. 1 and 2), Defendant seemed to be coasting.  He utterly failed to access the job training opportunities offered by Probation and failed to secure legitimate employment apart from odd jobs with family and friends.  His "whatever" attitude is reflected in his complete lack of appreciation throughout this period for the efforts of his supervising officer to get him involved in productive activities.  Further, he also was not consistently

---

[11] During this delay, Defendant served the state-imposed sentence for drug trafficking.

> compliant with the technical requirements of supervised release; for example, as of January 2013, he stopped submitting monthly supervision reports (Violation No. 5) and in June 2013, he failed to report for substance abuse testing (Violation No. 4). His only positive accomplishment seems to be eighteen negative (and no positive) drug screens.
>
> . . .
>
> When his words are juxtaposed with the harsh reality of Defendant's actual conduct in the aftermath of his release, it appears that the original sentence of just fourteen months – which was well below the applicable guidelines range – was a chance that Defendant has squandered.

ECF No. 22 at 7-8. Based on this conduct, the Court imposed a sentence of nine months of incarceration on all counts, followed by twenty-one months of supervised release. Supervised release recommenced on September 13, 2016, with an expiration date of June 12, 2018.

Defendant was next charged with violating his terms of supervised release in January 2018.[12] This time the petition charged an array of crimes committed throughout 2017, including four charges of driving with a suspended license, one charge of receiving stolen goods, and one felony charge of possession of heroin found in a custom-made pocket sewn to the inside of Defendant's underwear; he was also charged with three positive screens for marijuana. For the second set of violations, based on his admissions, Defendant was sentenced on October 30, 2018, to the nine months already served (having been in federal custody since his arrest on January 29, 2018), followed by twelve months of supervised release.

Defendant's next term of supervised release began on October 30, 2018. Within a little over three months, Defendant has racked up the three new criminal charges laid out in the instant petition. They include not only his possession of the black revolver in the rap video, but also two

---

[12] The 2018 petition was amended on January 29, 2018, to add a new violation based on the crime of felon in possession of ammunition, for which Defendant was also indicted. The violation proceedings were held in abeyance pending the outcome of Defendant's criminal case (CR No. 18-06WES) charging him with being a felon in possession of ammunition. Ultimately, both the add-on violation and the indictment based on being a felon in possession of ammunition were dismissed by text order on October 30, 2018. On the same day, Defendant was sentenced to time served, effectively nine months, based on his admissions to the other violations.

16

more charges of driving without a license.  In addition, during this short period, he twice failed to attend treatment.

In considering Defendant's history and characteristics, it is appropriate to look at his recent performance on supervision during the short period since his release on October 30, 2018, in context with what has gone before.[13]  Apart from his persistence in committing new crimes during the nearly seven years that he has been on federal supervision, the record establishes that, throughout those years when Defendant was not incarcerated, Probation had been striving in vain to assist Defendant in getting his license and procuring employment.  His "whatever" attitude, ECF No. 22 at 7, appears to have been sustained throughout the period of supervision, as reflected in four convictions for driving without a license, plus two newly charged in the most recent period, and a spotty work history, consisting of short stints with temporary agencies and with entities such as Dunkin Donuts.  Somewhat ironically, at his initial appearance on these violations, Defendant argued for release claiming he was (finally) about to attend a hearing as a step towards getting a driver's license.  In light of his track record of seven years of driving illegally, including the two new charges in the short period since his release on October 30, 2018, juxtaposed with Probation's persistent efforts over those years to support him so he could legally drive, this representation that he was just about to do better rings as hollow as similar sentiments expressed at other times over the years that this case has been pending.  See ECF No. 22 at 9 (noting that Defendant's 2015 expression of intent to do better "is buttressed by nothing

---

[13] This is not to suggest that the past conduct should be sanctioned again, but rather that the present conduct should be examined in light of Defendant's overall history and characteristics.  See 18 U.S.C. § 3553(a)(1); 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider").

beyond his words, which now ring hollow when compared to the same sentiments articulated the last time he faced sentencing by this Court").

Similarly, I do not find the recent pattern of a few weeks of working for a temporary agency and part-time work at Dunkin Donuts to be sufficient to evidence a turnaround commitment to sustained employment.[14]  And Defendant's achievement reflected in the paucity of positive drug screens (none in the current period and only a handful of positives for marijuana in the past) must be viewed in light of Defendant's convictions for drug trafficking and possession of heroin; that is, the lack of evidence of significant drug use defeats any inference that Defendant's conduct was merely that of an addict driven by addictive disease.  The only real accomplishment – Defendant's MRT attendance – is insufficient to offset what is otherwise a grim picture evincing profound lack of respect for the Court's conditions.

2.    Defendant's Gang Membership and Gang Signs Used in Rap Video

In addition to Defendant's extremely troubling criminal history and failure to respond to supervision, at the sentencing hearing on April 12, 2019, the government laid a further factual foundation by calling DOC Correctional Officers Sabrina Zaniol and Stephen Perry.  I found both witnesses to be highly credible; I also found Officer Perry well qualified to testify as an expert regarding gangs and their activity in Rhode Island, including gang signs and symbols. The government offered two exhibits: one was a group of four photos taken at the ACI of Defendant's tattoos, which was admitted for the limited purpose described below; the other was a "Scars and Tattoo Sheet," signed by Defendant at the ACI on November 8, 2017, which was admitted full.

---

[14] Defendant argued that the recent work is significant because it is the first time he has ever worked.  That argument is belied by the record which reflects that Defendant's current spotty work history is essentially the same as what he has been doing during periods when he is not incarcerated since he was twenty-one years old.

Officer Zaniol testified that she has worked in the committing room at Intake for the ACI for twenty-two years. During intake, she takes photographs and performs an intake interview, including to determine characteristics affecting where an inmate can be safely housed, such as gang membership, enemies and tattoos. Based on the interview and her observation, she fills in a form called, "Scars and Tattoo Sheet," on which she records all scars and tattoos, as well as the inmate's answers about gang membership, gang affiliation and enemies; she and the inmate both sign the form. Consistent with her usual procedure, on November 8, 2017, Officer Zaniol conducted an intake interview with Defendant. On the "Scars and Tattoo Sheet," she recorded that Defendant told her that he was a member of the Trinitarios gang but had no enemy issues; she also noted Defendant's tattoos. Both she and Defendant signed the form. Because of Defendant's gang membership, Officer Zaniol directed the form to the special investigation unit of the ACI.[15] A copy of the signed (by Defendant and Officer Zaniol) form, together with the photograph of Defendant taken by Officer Zaniol, was admitted full as Exhibit 32.[16]

Lieutenant Perry testified that he has worked at the ACI for twenty-two years and that his duties are focused on gang-related issues. He described the many trainings he has attended regarding gangs and gang identification, at which he has learned about gang markers, trends, colors and tattoos. He explained that, as an employee of the ACI, he focuses on gang membership as a critical security consideration to prevent violence, retaliation, fighting and gang recruiting, both inside the facility and during inmate transportation. His job is to know "who's who" so that fights and issues can be minimized or avoided. To discharge these duties,

---

[15] While a copy of the earlier form was not available, the government stipulated that a "Scars and Tattoo Sheet" had been completed five months earlier, on July 13, 2017, and that the earlier form does not indicate that Defendant said he was a Trinitarios gang member.

[16] Officer Zaniol did not independently recall her interview with Defendant.

19

Lieutenant Perry routinely walks through the ACI and talks to gang members; he asks known gang members about current rivals, the rules of the gang and gang paraphernalia.  Also in connection with his duties, Lieutenant Perry routinely exchanges gang intelligence with federal and local law enforcement agencies, including the Providence Police and the FBI.  He is responsible for running and presenting at DOC's monthly meeting on gangs, attended by state, local and federal agencies.  Lieutenant Perry specifically explained his familiarity with the Trinitarios gang, not only from training he has received, but also from dealing directly with Trinitarios members housed at the ACI, including from post-fight interviews, tattoo photographs and his practice of walking around the facility and talking to known gang members.

Based on this foundation, I accepted Lieutenant Perry as an expert on matters related to gangs, gang activity in Rhode Island and gang indicia, including the Trinitarios gang.

Lieutenant Perry explained that Trinitarios is a national gang up and down the East Coast and in the Dominican Republic.  It runs guns and narcotics, anything to make money outside of the prisons.  It recruits new members through social media and uses social media to taunt rivals. Within the ACI, it is involved in extortion, fighting and controlling areas of the prison. Trinitarios rivals are various street gangs, including Congress, Hanover Boyz Crips, and Crips. Trinitarios members self-identify with hand signs, tattoos, lime-green accessories, and "7"; a common Trinitarios hand sign looks like a gun or a "7," reflecting the seven principles in the Trinitarios bylaws.  Lieutenant Perry demonstrated the "7" sign, as well as another Trinitarios hand signal.

Focusing on the rap video, Lieutenant Perry explained that he had watched it several times.  He pointed out at least two instances of Defendant making Trinitarios hand signs; he also pointed out that Defendant appears in the video wearing a distinctive Trinitarios bandana of

20

yellowish/lime-green, at times over his face and at times around his neck.  Lieutenant Perry also testified about four photographs of Defendant's tattoos (Gov. Ex. 31).  Because Lieutenant Perry did not take the photographs himself and was unable to pin-point when they were taken, the Court has admitted Exhibit 31 for a limited purpose: based on Lieutenant Perry's testimony that the symbol appearing on the fourth page is a representation of the distinctive Trinitarios "157" symbol, which the Court was clearly able to see on Defendant's hand as he sat in Court, I find that Defendant currently has at least one readily visible Trinitarios tattoo.

Lieutenant Perry testified about his personal interactions with Defendant during ACI incarcerations during the past three years, including once after a gang-related fight involving Defendant.  During these interactions, Lieutenant Perry talked to Defendant about Trinitarios gang membership and Defendant told Lieutenant Perry that he belonged to the Trinitarios gang. In addition, based on information learned from New York law enforcement regarding a document that had been recovered in the course of an investigation, Lieutenant Perry testified that he believed that Defendant was a Rhode Island leader in the Trinitarios gang; in reliance on the belief that Defendant had influence over other Trinitarios gang members at the ACI, Lieutenant Perry frequently singled him out to discuss recruiting and the avoidance of fights.[17] That is, Lieutenant Perry's interactions with Defendant amounted to an attempt to cause Defendant to exercise his influence over other Trinitarios gang members to maintain peace at the ACI, including after Defendant himself had a fight with a rival gang member.  In response to these overtures, Lieutenant Perry testified that Defendant tried to downplay the Trinitarios

---

[17] I accepted as true Lieutenant Perry's belief that Defendant has influence with other Trinitarios gang members, including that he made a point of talking to Defendant frequently about what was going on at the ACI in light of that belief.  I do not find that Defendant is actually the leader of the Rhode Island branch of the Trinitarios gang; the evidence presented was insufficient to establish the reliability of the hearsay to that effect.

activity, telling Perry that everything is good, there are no issues, no one is recruiting members and he is just trying to bide his time until released.

Over Defendant's relevancy objection, Lieutenant Perry testified that, within the past three years, he has personally investigated Trinitarios gang friction at the ACI and he is aware that it arises from gang rivalry in the Providence area manifesting in violence, shootings and stabbings. He explained that social media plays a role in this cycle of violence in that, after an incident, gang members post about how the gang was disrespected.

Based on this evidence, I find that the government has proven by a preponderance of the evidence that Defendant has continuously been a member of the Trinitarios gang since at least November 8, 2017, when he told Officer Zaniol that he was, through to December 2018, when he appeared in the rap video flashing Trinitarios hand signals and wearing a Trinitarios bandana, as confirmed by one Trinitarios tattoo currently visible on his body. I further find, by a preponderance, that Defendant's participation in the rap video is an example of the use by the Trinitarios gang of social media to taunt rivals (potentially provoking violence) and/or to recruit new gang members. I further find by a preponderance that Defendant's gang membership has caused him to be involved in at least one fight, as well as that, during the period when Defendant has been a member, the Trinitarios gang has been linked to violence in the community and inside the ACI.

## B.    Law Applicable to Sentencing on Violation Nos. 1, 2, 3 and 5

According to 18 U.S.C. § 3583(e)(3), the Court may revoke a term of supervised release and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, if the Court finds by a

22

preponderance of evidence that the defendant has violated a condition of supervised release. The prison term is limited in that Defendant, who was on supervision for Class C felony, may not be sentenced to a term beyond two years. According to 18 U.S.C. § 3583(h) and § 7B1.3(g)(2) of the United States Sentencing Guidelines ("USSG"), when a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized, the Court may impose a new term of supervised release. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release. In this case, the authorized statutory maximum term of supervised release is three years. There has been a total of eighteen months imprisonment previously imposed for violations of supervised release. Therefore, the Court may impose the statutory maximum of thirty-six months, minus the eighteen months previously imposed, minus the term of imprisonment that is to be imposed for this revocation.

Section 7B1.1 of the USSG provides for three grades of violations (A, B and C). Subsection (b) states that where there is more than one violation, or the violation includes more than one offense, the grade of violation is determined by the violation having the most serious grade. Grade B violations[18] are conduct constituting any other offense punishable by a term of imprisonment exceeding one year, while Grade C violations are conduct constituting an offense punishable by a term of imprisonment of one year or less; or a violation of any other condition of supervision. Section 7B1.3(a)(1) states that upon a finding of a Grade B violation, the Court shall revoke supervision, while upon a finding of a Grade C violation, the Court may revoke,

---

[18] Grade A is not in issue in this case.

23

extend or modify the conditions of supervision.  In this case, guilt on Violation Nos. 1, 2, 3 and 5 establish that Defendant has committed a Grade B violation; therefore, the Court shall revoke supervision.  However, if the Court finds Defendant not guilty of Violation No. 1, what remains is Grade C, in which event the Court may revoke, extend or modify the conditions of supervision.

Section 7B1.4(a) of the USSG provides that the CHC is the category applicable at the time the defendant was originally sentenced.  In this instance, Defendant was CHC I at the time of sentencing.  Should the Court revoke supervised release, the Revocation Table provided for in § 7B1.4(a) provides the applicable imprisonment range.  For a Grade B violation committed by a defendant classified as CHC I, the applicable range of imprisonment is four to ten months.[19]

As itemized in 18 U.S.C. § 3583(e), the factors that the court may consider in setting the length of the sentence to be imposed following a revocation of supervised release are some (but not all) of the sentencing factors listed in 18 U.S.C. § 3553(a).  As relevant here, they include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and the applicable guidelines and policy statements issued by the Sentencing Commission.  18 U.S.C. §3553(a).  The USSG makes clear that the sanction for a supervised release violation should focus on the defendant's failure to follow the court-imposed conditions as a "breach of trust" and not on the need to punish the new criminal conduct.  USSG § 7A.3(b).

---

[19] If Defendant is found not guilty of Violation No. 1, the range drops to three to nine months.

24

Any sentence must be both procedurally and substantively reasonable.  United States v. Calderon-Lozano, 912 F.3d 644, 647 (1st Cir. 2019); United States v. Gutierrez, 673 F. App'x 919, 922 (11th Cir. 2016) (same in supervised release context).  Examples of procedural errors include "failing to calculate (or improperly calculating) the guidelines range, treating the guidelines as mandatory, failing to consider the appropriate § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Gall v. United States, 552 U.S. 38, 51 (2007).  A sentence is substantively reasonable as long as the court provides "a plausible sentencing rationale and a defensible result"; in this Circuit, a sentence within the properly calculated guideline range "deserves 'a presumption of reasonableness,'" Calderon-Lozano, 912 F.3d at 648-49, although the court may impose a sentence that exceeds the range, either as an upward departure for a reason reflected in the USSG or it may exercise its discretion to impose a higher sentence as a variance in light of the § 3553(a) factors.  United States v. Yepiz, 718 F. App'x 456, 475 (9th Cir. 2017), cert. denied, 138 S. Ct. 1340 (2018).  For supervised release violations, the district court may impose an upward variance after "an individualized assessment based on the facts presented" and an "adequate [ ] expla[nation of] the chosen sentence."  United States v. Mulero-Diaz, 812 F.3d 92, 98 (1st Cir. 2016).

In the supervised release context, the policy statement "range" does not carry all of the same legal meaning appurtenant to the calculation of the "guidelines range" for the original sentence.  Indeed, the supervised release ranges are set forth in a policy statement specifically to afford "greater flexibility."  USSG § 7A.3(a).  Nevertheless, core principles remain true: "A sentencing judge, 'draw[ing] upon his familiarity with a case[ and] weigh[ing] the factors enumerated in 18 U.S.C. § 3553(a),' may 'custom-tailor an appropriate sentence' above the

25

applicable [guideline range]." United States v. Viloria-Sepulveda, 921 F.3d 5, 8-9 (1st Cir. 2019) (quoting United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013)).  And, to the extent that facts are considered, § 3553(a) "invite[s] the district court to consider, broadly, any reliable information relevant not only to the history and characteristics of the defendant but also to the factors such as . . . the need to afford adequate deterrence to criminal conduct, and the need to protect the public from further crimes of the defendant."  Id. at 10 (internal citation and quotation marks omitted).  Relatedly, the First Circuit has also held that "[f]actual findings at sentencing must satisfy only a preponderance of the evidence standard."  United States v. Rodriguez-Cardona, 924 F.2d 1148, 1155 (1st Cir. 1991); see Gutierrez, 673 F. App'x at 923 ("relevant facts at [supervised release] sentencing must be established by a preponderance of the evidence").

During a sentencing hearing, as during a revocation hearing, neither the Federal Rules of Evidence nor the Sixth Amendment's confrontation clause applies, United States v. Bramley, 847 F.3d 1, 5 (1st Cir. 2017).  Thus "the sentencing court has broad discretion to accept hearsay evidence at sentencing so long as the court supportably concludes that the information has sufficient indicia of trustworthiness."  United States v. Rodriguez, 336 F.3d 67, 71 (1st Cir. 2003).

### C.   Upward Departure Based on Inadequate CHC Classification

Supervised release revocation ranges are based on the defendant's CHC classification at the time of the imposition of the original sentence.  USSG §7B1.4, commentary (n.1).  In this case, Defendant was CHC I when he was originally given a lenient below-guidelines sentence in 2012 at the age of twenty-two.  However, the USSG also provides that "an upward departure may be warranted when a defendant, subsequent to the federal sentence resulting in supervision,

26

has been sentenced for an offense that is not the basis of the violation proceeding." USSG §7B1.4, commentary (n.2). As further developed in § 4A1.3, upward departure may be based on the inadequacy of the CHC if there is a prior sentence for substantially more than one year imposed as a result of independent crimes committed on different occasions or other prior sentences that were not used in computing the CHC. USSG § 4A1.3(a)(2). In considering this basis for an upward departure, the court must identify the specific reasons why the applicable CHC substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes. USSG § 4A1.3(a)(1). The USSG notes that it is "particularly true" that a defendant's criminal history may be more serious "in the case of younger defendants (*e.g.*, defendants in their early twenties or younger) who are more likely to have received lenient treatment, yet who may actually pose a greater risk of serious recidivism than older defendants." USSG § 4A1.3, commentary background.

This USSG basis for an upward departure applies in this case.[20] In 2012, Defendant was the paradigmatic youthful offender whose adult criminal record was skimpy due to his age and who was sentenced leniently, well below the guidelines range provided for a CHC I offender. The crime spree since Defendant has been under supervision establishes that CHC I grossly understates the seriousness of his history and the likelihood that he will commit other crimes. If

---

[20] It must be noted that the Court's research did not turn up any cases discussing whether this is the correct interpretation of Notes 1 and 2 in the Commentary to USSG § 7B1.4. Accordingly, the Court has relied on the plain meaning of the relevant portions of USSG Chapters 4 and 7. In this regard, Note 1 states, "[t]he criminal history category is not to be recalculated," while Note 2 states, "an upward departure may be warranted when a defendant, subsequent to the federal sentence resulting in supervision, has been sentenced for an offense that is not the basis of the violation proceeding" – read together, these make clear that an upward departure is permitted, but not a recalculation of the CHC. Also unambiguous is the Note 2 directive that the court should exclude from consideration the offenses that are the basis for "**the** violation proceeding." USSG § 7B1.4, commentary (n.2) (emphasis supplied). Thus, crimes already sanctioned by earlier violation proceedings may be counted in assessing whether the assigned CHC is inadequate. This interpretation is also consistent with the purpose of such an upward departure, which is to look at the seriousness of the subsequent criminal history and its impact on the individual's likelihood of committing other crimes. See USSG § 4A1.3(a)(1).

27

the Court applies the principles in USSG § 4A1.3(a),[21] the result suggests that CHC IV is more accurately reflective of Defendant's criminal history and his likelihood of recidivism.  For Grade B violations of supervised release, CHC IV carries a range of twelve to eighteen months.

### D.      Upward Variance Based on Deterrence and Protection of Community

For supervised release violations, the district court may impose an upward variance based on the applicable § 3553(a) factors.  Mulero-Diaz, 812 F.3d at 98.  By weighing the § 3553(a) factors, the Court may "custom-tailor an appropriate sentence."  Viloria-Sepulveda, 921 F.3d at 8.

When considering the deterrence factor, § 3553(a)(2)(B), an upward variance is appropriate if lesser sentences had previously been imposed for prior offenses but were ineffective at deterring a defendant from continuing to engage in future misconduct.  United States v. Elders, 467 F. App'x 793, 796 (10th Cir. 2012).  That is, the Court may base its sentence on Defendant's failure to have been deterred by a prior sentence, and concern about the need for a sentence of sufficient length to provide deterrence.  United States v. Parsons, 711 F. App'x 1, 4 (1st Cir. 2017).  A substantial sentence is also appropriate to provide general deterrence to similarly situated persons.  United States v. Foy, 646 F. Supp. 2d 1055, 1065 (N.D. Iowa 2009), aff'd, 617 F.3d 1029 (8th Cir. 2010).

In connection with the § 3553(a)(2)(C) factor that permits the court to examine the need "to protect the public from further crimes of the defendant," gang membership and gang activity, if factually established, are appropriately considered in connection with supervised release

---

[21] For purposes of the USSG § 4A1.3 analysis, Defendant's 2010 possession conviction [one point] is amplified by subsequent criminal history including the following offenses committed after the federal sentence resulting in supervision: the 2014 drug trafficking conviction [three points], the 2015 assault conviction [one point], the 2017 possession conviction [two points], and the 2017 stolen goods conviction [one point].  This yields eight points, squarely within range for CHC IV.  The analysis should not include the underlying crime in this case, or the crimes underlying the violations for which Defendant is presently being sentenced.  USSG § 7B1.4, commentary (n.2).

28

sentencing.[22] <u>United States v. Castaneda</u>, No. 17-50185, 2018 WL6735198, at \*1 (9th Cir. Dec. 24, 2018) (no error in supervised release sentence at cap of twenty-four months in light of court's discussion of gang membership, recidivism and danger to the community); <u>United States v. Gibbs</u>, 897 F.3d 199, 202 (4th Cir. 2018) (no error in supervised release sentence at cap of twenty-four months in light of court's consideration of defendant's "history of gang affiliation" and criminal history).  Similarly, when factually well-founded, gang activity is frequently mentioned as bearing on the same § 3553(a) factor (the need "to protect the public") by courts considering the length of the original sentence.  <u>See, e.g.</u>, <u>Yepiz</u>, 718 F. App'x at 474 (because defendant's gang membership and drug trafficking establish he is danger to the community and requires substantial sentence so he cannot commit further crimes); <u>United States v. Robinson</u>, 428 F. App'x 103, 107 (2d Cir. 2011) (sentence is substantively reasonable where court relied on, *inter alia*, "admitted participation in a violent street gang and firearm possession"); <u>United States v. Santiago</u>, 250 F. App'x 736, 738 (7th Cir. 2007) (in considering 18 U.S.C. § 3553(a) factors regarding length of sentence, appropriate for court to make findings and rely on conclusion that defendant was "a dangerous, high-ranking gang member who merited a sentence at the high end of the guidelines range"); <u>United States v. Rivera</u>, 281 F. Supp. 3d 269, 287-88 (E.D.N.Y. 2017) (gang membership considered as relevant to danger to community in establishing length of sentence based on 18 U.S.C. § 3553(a) factors); <u>cf.</u> <u>United States v. Martins</u>, 413 F.3d 139, 150 (1st Cir. 2005) (reasonable suspicion for protective sweep sufficiently based, *inter alia*, on inference of danger grounded in police experience with gang

---

[22] Defendant argued vehemently that whether or not he was or is in a gang (which he did not admit) was absolutely irrelevant to sentencing and should not be considered.  Based on this objection, the Court invited the parties to submit case law in advance of the April 12, 2019, hearing.  Nothing was submitted; the Court did its own research, based on which the government was allowed to proceed with evidence of Defendant's gang membership and its link to the rap video.  After the hearing on April 12, 2019, Defendant asked the Court to provide a list of the cases on which the Court relied; the case list was provided to both parties on April 17, 2019.

activity in area).  The relationship between gang activity and danger to the community is also frequently acknowledged in other settings.  United States v. Norris, Criminal Case No. 15-cr-414-WJM, 2019 WL 339900, at *3 (D. Colo. Jan 28, 2019) (at detention hearing, "association with gang members are activities that endanger other individuals and community safety").  Relatedly, in considering protection of the public, the court may also consider the impact of violence of the type caused by a defendant on the affected community.  Flores-Machicote, 706 F.3d at 22-23 ("Within this taxonomy, it is permissible for a sentencing court to consider the incidence and trend lines of particular types of crime in the affected community.").

### E.   Recommended Sentence for Violation Nos. 1, 2, 3 and 5

Based on Defendant's admissions, his history and characteristics and the facts established by the evidence summarized above, at both the revocation and the sentencing hearings, the government requested a sentence well above the policy statement range of four to ten months.  Mindful of the cabining effect of the statutory maximum (twenty-four months) and focusing on the understatement reflected in the classification of Defendant as CHC I, Defendant's profound breach of trust and the need for deterrence and to protect the public, it urged me to recommend an incarcerative sentence of eighteen months.  Such a sentence is not only well above the CHC I range of four to ten months, but, as the government acknowledged, would preclude any further supervision.  The government argued that no more supervision is appropriate in light of Defendant's utter failure to respond positively to supervision throughout the nearly seven years that he has been subject to it.

Defendant countered with an array of arguments.  First, he contends that sentencing should not be based on the lyrics of the rap video; however, the Court did not admit the lyrics and I have not considered them.  Second, he asserts that he is not a member of the Trinitarios

30

gang; however, I find otherwise, in that the government's evidence of his ongoing Trinitarios membership from at least 2017 to the present was overwhelming. Third, Defendant correctly points out that a violation sentence must be based on the breach of trust, not on the underlying criminal conduct and not for what he has been sentenced for in the past; at the same time, however, in considering Defendant's history and characteristics, the Court cannot ignore Defendant's past crimes, § 3553(a)(1); moreover, in addition to the breach of trust, the Court must also consider the § 3553(a)(2)(B-C) factors of deterrence and the protection of the public. Finally, Defendant contends that he should not be sentenced just because he is a gang member and assumed to be a danger. However, I find that the government's proof is not so limited. Rather, it has proven by a preponderance that Defendant's gang activities, including those on display in the rap video, establish a likelihood of danger, implicating the § 3553(a)(2)(C) need for a sentence to protect the public.

Defendant waived his right to allocution.

There are three reasons, each of which – standing alone – is sufficient, that support my recommendation that the Court impose an eighteen-month sentence as the government urges.

First, the USSG provides for an upward departure based on the inadequacy of Defendant's CHC I classification to capture the seriousness of his criminal history during the nearly seven years he has been on supervision. Defendant's unrelated crimes committed during this period would place him at CHC IV, which carries a range of twelve to eighteen months. When the USSG provisions addressing the inadequacy of a CHC classification used for supervised release sentencing are applied, the government's proposal of an upward departure to eighteen months falls into the range of a sentence that is both substantively and presumptively reasonable. I recommend that the Court adopt it.

Second, the § 3553(a) factor of deterrence is a reason to impose a sentence that is materially more than the nine months imposed for each of Defendant's two prior supervised release revocations. With one felony and four misdemeanors racked up within just sixteen months of release from the first revocation sentence of nine months, and a new felony charge and two more misdemeanors charges within just four months of release from the second revocation sentence of nine months, it is pellucid that a sentence at or near nine months is grossly inadequate to deter Defendant from committing new crimes. I recommend that the Court impose a sentence doubling from nine to eighteen months based on the need for deterrence of Defendant, as well as for general deterrence of other defendants who are considering whether to continue gang-involvement during federal supervision.

Third, the protection of the public is an important § 3553(a)(2) sentencing consideration. In this instance, the government has demonstrated by a preponderance of the evidence: that Defendant is a member of the Trinitarios gang; that, while on supervision, he appeared in a rap video that was subsequently posted on social media, in which he possessed and displayed a firearm, made Trinitarios hand signals and wore Trinitarios paraphernalia; that, within the recent past, he was involved in a fight at the ACI arising from Trinitarios gang rivalry; that the Trinitarios gang uses social media (such as the publicly-posted rap video in which Defendant appeared) to taunt rivals and recruit new members; and that, during the period of Defendant's membership, the Trinitarios gang has been involved with violence in the community and inside the ACI. This is enough to establish that Defendant's sentence should be varied up from the applicable range based on the § 3553(a)(2)(C) factor of the need to protect the public. Because I find that the government has demonstrated that Defendant's ongoing gang involvement poses a

32

serious risk that he will recidivate and endanger the public, I recommend that the Court vary upward to eighteen months, for the purpose of achieving this sentencing goal.

Mindful that Defendant will remain on state probation for many years based on his 2014 conviction for drug trafficking, I make this recommendation in recognition that an eighteen-month sentence forecloses further supervision. This aspect of the recommendation is also influenced by the unfortunate reality that, over the seven years since his original conviction, Defendant does not appear to have taken advantage of the rehabilitation opportunities that supervision made available.

## IV.     CONCLUSION

Based on foregoing factual findings, I recommend that the Court find Defendant guilty of Violation No. 1 and not guilty of Violation No. 4; based on Defendant's admissions, I recommend that the Court find the Defendant guilty of Violation Nos. 2, 3 and 5. Based on these violations, after considering the appropriate factors set forth in 18 U.S.C. § 3553(a) and for the reasons expressed above, I recommend that the Court revoke supervised release and impose a term of eighteen months of incarceration with no supervised release to follow.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Crim. P. 59(b); DRI LR Cr 57.2(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
May 8, 2019